IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

THE HANOVER INSURANCE COMPANY, )
 Bedford Executive Office Park )
 2 Executive Park Drive )
 Bedford, NH 03110 )
 )
   Plaintiff, )
 )
v. )
 )
ENGINEERED SYSTEMS ALLIANCE, )
LLC, )
 1900 Oracle Way, Suite 700 )
 Reston, VA 20190, )
 )
and )
 )
HONEYWELL INTERNATIONAL, INC., )
 101 Columbia Road )
 Morristown, NJ 07962, )
 )
   Defendants. )
 )
_____ )
 )
ENGINEERED SYSTEMS ALLIANCE, ) Civil Action No. 8:15-cv-00112-TDC
LLC, )
 )
   Counterclaimant, )
 )
v. )
 )
THE HANOVER INSURANCE COMPANY )
 )
   Counterdefendant. )
 )
_____ )
 )
ENGINEERED SYSTEMS ALLIANCE, )
LLC, )
 )
   Cross-Plaintiff, )
 )
v. )
 )
HONEYWELL INTERNATIONAL, INC. )
 )
   Cross-Defendant. )
_____ )

## ANSWER, COUNTERCLAIM, AND CROSSCLAIM OF DEFENDANT ENGINEERED SYSTEMS ALLIANCE, LLC

## ANSWER

Pursuant to Rule 8 of the Federal Rules of Civil Procedure, for its answer to the complaint filed by The Hanover Insurance Company ("Hanover"), Defendant Engineered Systems Alliance, LLC ("ESA") admits, denies, and alleges as follows:

1.      Paragraph 1 asserts a legal conclusion and, therefore, no response is required.  To the extent that a response is required, ESA admits that Hanover has brought an action under Section 2201 of Title 28 of the United States Code and Rule 57 of the Federal Rules of Civil Procedure.

2.      ESA admits the allegations asserted in Paragraph 2.

3.      ESA admits that it has submitted a claim for coverage under Insurance Policy No. IHR-9041893-06 issued by Hanover.  Except as herein admitted or expressly denied, ESA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations asserted in Paragraph 3 and therefore denies the same.

4.      ESA admits that it received a letter from Hanover, dated September 26, 2014, stating that Hanover would investigate ESA's claim subject to a full and complete reservation of rights (the "September 26, 2014 Reservation of Rights Letter").  ESA denies that Hanover's September 26, 2014 Reservation of Rights Letter states that Hanover would undertake a "complete" investigation of ESA's claim.  ESA further admits that Honeywell International, Inc. ("Honeywell") served as the general contractor of the construction project at issue and that Honeywell is an additional insured under the Policy.  Except as herein admitted or expressly denied, ESA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations asserted in Paragraph 4 and therefore denies the same.

5.    ESA admits that the actual controversy relates to Hanover's coverage obligations under the Policy, including Hanover's indemnity obligation.

6.    ESA admits that Hanover has asserted that there is no coverage with respect to the loss.  Except as herein admitted, ESA denies the allegations asserted in Paragraph 6.

7.    ESA admits the allegations asserted in Paragraph 7.

8.    ESA denies the allegations asserted in Paragraph 8.  ESA is a limited liability company organized under the laws of the Commonwealth of Virginia.

9.    ESA lacks sufficient knowledge or information to form a belief as to the truth of the allegations asserted in Paragraph 9 and therefore denies the same.

10.    Paragraph 10 asserts a legal conclusion and, therefore, no response is required. To the extent that a response is required, ESA admits the allegations asserted in Paragraph 10.

11.    Paragraph 11 asserts a legal conclusion and, therefore, no response is required. To the extent that a response is required, ESA admits the allegations asserted in Paragraph 11.

12.    Paragraph 12 asserts a legal conclusion and, therefore, no response is required. To the extent that a response is required, ESA admits the allegations asserted in Paragraph 12.

13.    Paragraph 13 asserts a legal conclusion and, therefore, no response is required. To the extent that a response is required, ESA further states that it is premature to address choice-of-law at this time and therefore denies the allegations.

14.    ESA admits the allegations asserted in Paragraph 14.

15.    ESA admits the allegations asserted in Paragraph 15.

16.    ESA admits that the CUP was intended to provide power and utilities to certain FDA headquarters facilities located at 10903 New Hampshire Avenue, Silver Spring, Maryland.

17.    ESA admits that it entered into a Building Solutions Subcontract Agreement with

Honeywell on February 18, 2011.  Except as herein admitted, ESA denies the allegations asserted in Paragraph 17.

18.     ESA denies the allegations asserted in Paragraph 18.

19.     ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 19 and therefore denies the same.

20.     ESA admits that the G-9 is a natural gas turbine that provides power and steam to the FDA facility.  Except as herein admitted, ESA denies the allegations asserted in Paragraph 20.

21.     ESA admits that it installed the G-9 and the IAC-9 Coils, and that the G-9 and IAC-9 Coils were procured by Honeywell from Solar Turbines, Inc.  Except as herein admitted, ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 21 and therefore denies the same.

22.     ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 22 and therefore denies the same.

23.     ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 23 and therefore denies the same.

24.     ESA admits that the IAC-9 Coils were subjected to a draining process on or about November 11, 2013.  Except as herein admitted, ESA denies the allegations in Paragraph 24.

25.     ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 25 and therefore denies the same.

26.     ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 26 and therefore denies the same.

27.     ESA admits that the manual value may have been opened by any party who had

access to the facility.  Except as herein admitted, ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 27.

28.    ESA lacks knowledge or information sufficient to form a belief about the truth of the statements that the system was being operated by Brooks and Brooks Services, Inc., or that 450 gallons of water were drawn into the G-9 system.  ESA otherwise admits the allegations in Paragraph 28.

29.    ESA admits the allegations asserted in Paragraph 29.

30.    ESA admits the allegations asserted in Paragraph 30.

31.    ESA admits that it received from Hanover the September 26, 2014 Reservation of Rights Letter, which stated that Hanover would investigate ESA's claim to determine what, if any coverage is afforded under the Policy.  ESA denies that the September 26, 2014 Reservation of Rights Letter states that Hanover would undertake a "complete" investigation of ESA's claim.

32.    Paragraph 32 asserts a legal conclusion and, therefore, no response is required. To the extent that a response is required, ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 32 and therefore denies the same.

33.    ESA admits that it and Honeywell have maintained their position that they are entitled to coverage under the Policy for the loss.  ESA denies that it has not provided Hanover with answers, documentation, and reports in response to Hanover's inquiries regarding subject matters with respect to which ESA possessed answers, documentation, and/or reports.  Except as herein admitted or expressly denied, ESA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations asserted in Paragraph 33 and therefore denies the same.

34.    ESA admits the allegations asserted in Paragraph 34.

35.      ESA repeats and incorporates by reference its responses to Paragraphs 1 through 34.

36.      ESA admits that the language quoted in paragraph 36 is contained in the Policy. The remaining allegations set forth in Paragraph 36 assert a legal conclusion and, therefore, no response is required.

37.      ESA denies that one or more of the events listed in Section I.B. had been satisfied prior to the date of loss.  ESA lacks knowledge or information regarding the "facts" purportedly "known" by Hanover as of the date it filed the Complaint and further lacks knowledge or information sufficient to form a belief as to what Hanover "ha[d] reason to believe" as of the date it filed the Complaint and therefore denies the same.

38.      ESA denies the allegations in Paragraph 38.

39.      ESA denies the allegations in Paragraph 39.

40.      ESA denies the allegations in paragraph 40.

41.      ESA denies the allegations in Paragraph 41.  ESA also is unaware of the facts known by Hanover at the date Hanover filed the complaint and, therefore, lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 41 and therefore denies the same.

42.      ESA repeats and incorporates by reference its responses to Paragraphs 1 through 41.

43.      ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 43 and therefore denies the same.

44.      ESA admits that the language quoted in Paragraph 44 is contained in the Policy.

45.      ESA is unaware of the facts known by Hanover at the date Hanover filed the

complaint and, therefore, lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 45 and therefore denies the same.

46.    ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 46 and therefore denies the same.

47.    ESA repeats and incorporates by reference its responses to Paragraphs 1 through 46.

48.    ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 48 and therefore denies the same.

49.    ESA admits that the language quoted in Paragraph 49 is contained in the Policy. The remaining allegations set forth in Paragraph 49 assert a legal conclusion and, therefore, no response is required.

50.    ESA is unaware of the facts known by Hanover at the date Hanover filed the complaint and, therefore, lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 50 and therefore denies the same.

51.    ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 51 and therefore denies the same.

52.    ESA lacks knowledge or information sufficient to form a belief about the truth of the allegations asserted in Paragraph 52 and therefore denies the same.

WHEREFORE, ESA denies that Hanover is entitled to the relief requested in its Complaint.

## **AFFIRMATIVE DEFENSES**

ESA asserts the following affirmative defenses based on its information and belief:

## FIRST AFFIRMATIVE DEFENSE
(Estoppel)

Plaintiff has engaged in conduct and actions and/or entered into agreement(s) sufficient to estop it from asserting against Defendant ESA the claims alleged in the Complaint.

## SECOND AFFIRMATIVE DEFENSE
(Waiver)

Plaintiff's claims against Defendant ESA are barred by the doctrine of waiver.

## THIRD AFFIRMATIVE DEFENSE
(Full Performance)

Plaintiff's claims against Defendant ESA are barred because Defendant ESA has fully performed any contractual, statutory, or other alleged duties to Plaintiff, other than those which have been excused or discharged.

## FOURTH AFFIRMATIVE DEFENSE
(Excuse)

The failure of Plaintiff to perform pursuant to any alleged express or implied agreements, if any, between the parties excuses Defendant ESA from performing any obligations, if any, that it allegedly did not perform.

## FIFTH AFFIRMATIVE DEFENSE
(Unjust Enrichment)

Plaintiff would be unjustly enriched if it was awarded the declaratory relief requested in its Complaint and/or recovered any of the damages from Defendant ESA.

## SIXTH AFFIRMATIVE DEFENSE
(Unclean Hands)

Plaintiff's claims against Defendant ESA are barred by the doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE
(Justified Conduct)

Plaintiff's claims against Defendant ESA are barred because, at all times alleged in the

Complaint, Defendant ESA acted reasonably and properly, and in accordance with the terms of the parties' contract and under any applicable law.

## EIGHTH AFFIRMATIVE DEFENSE
### (Additional Affirmative Defenses)

Defendant ESA may have other and additional affirmative defenses based on facts or circumstances about which it is not presently aware and, therefore, reserves its right to assert them by amendment to this Answer.

## COUNTERCLAIM FOR DECLARATORY RELIEF AND FOR BREACH OF CONTRACT

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendant and Counterclaimant Engineered Systems Alliance, LLC ("ESA") asserts the following causes of action for declaratory relief and for breach of contract against Plaintiff and Counterdefendant The Hanover Insurance Company ("Hanover"), and alleges as follows:

## THE PARTIES

1.     ESA is a limited liability company organized under the laws of the Commonwealth of Virginia and maintains its principle place of business in Alexandria, Virginia.

2.     Upon information and belief, Hanover is a corporation organized under the laws of New Hampshire and maintains its principal place of business in Worcester, Massachusetts.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between ESA and Hanover, which are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.     Hanover is subject to personal jurisdiction because it regularly transacts business

in Maryland.  Additionally, by filing its Complaint in this Court, Hanover has waived its right to

dispute that the Court may exercise personal jurisdiction over Hanover.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because the

event triggering coverage under the Hanover insurance policy occurred in Montgomery County,

Maryland.   Further, Hanover has admitted, in Paragraph 11 of the Complaint, that venue is

proper in this judicial district.

## THE INSURED CONSTRUCTION PROJECT

6.      In or about 2010, the U.S. Food and Drug Administration ("FDA") sought to

expand the infrastructure at its Central Utility Plant in Silver Spring, Maryland (the "Project"),

which serves as a source of electrical power, chilled water, heating hot water, and steam for the

FDA's buildings at its White Oak Federal Research Center.

7.      In order to expand the infrastructure at the Project, in or about 2011, the U.S.

General Services Administration ("GSA"), on behalf of the FDA, entered into a contract with

Honeywell.   Under this agreement, Honeywell was to construct and then operate the facility

upon completion of the Project.

8.      On February 18, 2011, Honeywell entered into a Building Solutions Subcontract

Agreement with ESA for the design, construction, installation, and other services for the

infrastructure expansion at the Project.

## THE HANOVER BUILDERS RISK POLICY

9.      In exchange for substantial premiums, Hanover sold to ESA, as the Named

Insured, Commercial Lines Policy No. IHR 9041893 06, which provides, among other things,

Builder's Risk and Installation Coverage for the period of February 21, 2011 to July 1, 2014,

with a limit of $111,908,039 for any one "project site" and/or "loss" (the "Policy").

10.    The Policy's Builder's Risk and Installation Coverage Form states that Hanover "will pay for direct physical 'loss' to Covered Property. 'Loss' must be caused by or result from any of the Covered Causes of Loss and occur within the Coverage Territory."  Policy Form IM441-1057 07 08, at 2.

11.    The Policy defines "Covered Property" to include "property that is owned by 'you' or is property of others in 'your' care, custody or control from which 'you' are legally responsible consisting of : . . equipment or machinery which will become a permanent part of the 'project site' while: a. at the 'project site' awaiting, during and after construction, installation, erection or fabrication."  Policy Form IM441-1057 07 08, at 2.

12.    The Project is a "project site" covered by the Policy and the G-9 turbine, the IAC-9 Coils, and related equipment located at the Project's site is "Covered Property" under the Policy.

13.    The Policy states that "Coverage begins when 'you' acquire an interest in the Covered Property . . . and coverage ends at the earliest of the following:

1.    When 'your' interest in the property ceases;

2.    When the project is accepted by the owner or buyer;

3.    When the policy expires;

4.    On the cancellation date;

5.    One-hundred eighty (180) days after the project has been completed or is substantially completed (usable for its intended purpose), if no work on the project has taken place during that period;

6.    When 'you' abandon the construction of the project with no intention to complete it; or

7.    Unless 'we' endorse this policy otherwise, for Builder's Risk coverage only, thirty (30) days after the property is occupied in whole or in part, put into use for other than testing purposes or leased or rented to others.

\*　　\*　　\*

Occupancy at the 'project site' for its intended purpose does not negate coverage."

Policy Form IM441-1057 07 08, at 2.

14.　　ESA acquired an interest in the G-9 turbine, the IAC-9 Coils, and related equipment located at the Project's site on February 18, 2011, when it entered into the Building Solutions Subcontract Agreement with Honeywell.

15.　　The Policy defines "Covered Cause of Loss" to mean "RISK OF DIRECT PHYSICAL 'LOSS' to Covered Property except those causes of 'loss' listed in the Exclusions." Policy Form IM441-1057 07 08, at 3

16.　　The Policy also includes a Machinery Breakdown Endorsement, which states:

a.　　We will pay for 'loss' caused by or resulting from Accident to 'Covered Equipment.'　As used in this coverage part, an Accident means direct physical 'loss' as follows:

(1) mechanical breakdown of machinery including rupture or bursting caused by centrifugal force;

(2) artificially generated electric current that creates a short circuit or other electric disturbance within electrical devices, appliances or wires; or

(3) explosion of steam boilers, steam piping, steam engines, or steam turbines.

\*　　\*　　\*

The following is added to Section F – DEFINITIONS as respects machinery coverage.

'Covered Equipment' means Covered Property including fired or unfired pressure vessels built to operate under vacuum or pressure, other than weight of contents, or used for the generation, transmission or utilizing of energy.　However, 'Covered Equipment' does not include 'Production Machinery.'

'Production Machinery' means any machine or apparatus, including any cylinder containing a movable plunger or piston, that processes or produces a product intended for eventual sale."

Policy Form IM441-1063 07 08, at 1-2.

## ESA'S INSURED PROPERTY DAMAGE EVENT ARISING
## FROM THE CONSTRUCTION PROJECT

17.     Pursuant to its Building Solutions Subcontract Agreement with Honeywell, ESA installed a natural gas turbine generator ("G-9 Turbine), as well as the associated IAC-9 Coils and related equipment, that was furnished by Honeywell at the Project site.

18.     On or about November 11, 2013, ESA properly winterized and drained the IAC-9 Coils of water in compliance with the manufacturers' winterization protocol.

19.     On December 31, 2013, Honeywell notified the FDA that the Project was substantially complete, and the FDA accepted substantial completion of the Project on January 9, 2014.

20.     The IAC-9 Coils were damaged sometime between November 2013 and May 2014.  In or around May 2014, the G-9 Turbine and related equipment incurred significant water damage (collectively the "Turbine System Damage").

21.     Shortly thereafter, ESA timely notified Hanover of the Turbine System Damage and submitted a claim for coverage under the Policy.

22.     Over the ensuing months, ESA provided Hanover with information and documents in response to Hanover's requests for information and documentation, provided Hanover access to the loss location for inspection and investigation, and otherwise cooperated with Hanover's investigation and adjustment of ESA's claim.

23.     On September 26, 2014, Hanover sent ESA a Reservation of Rights Letter, in which Hanover acknowledged receipt of ESA's claim.  In that letter, Hanover stated that it would undertake the investigation of ESA's claim, subject to a full and complete reservation of its rights.

24.     In the ensuing months, ESA continued to cooperate with Hanover's ongoing

investigation and adjustment of the claim.

25.    On January 14, 2015, Hanover filed its Complaint initiating this action seeking a declaration that it does not have an obligation under the Policy to provide coverage to ESA or Honeywell for the Turbine System Damage.  To the best of ESA's knowledge, Hanover's filing of its January 14, 2015 Complaint was its first and only notification that it was denying coverage for ESA's claim.

26.    In its Complaint, Hanover admits that its coverage determination was not based on all of the relevant facts.  *See* Compl. ¶ 33.

27.    In its Complaint, Hanover failed to identify the factual basis for its determination that the Turbine System Damage is not covered by the Policy.

28.    To date, Hanover has not provided ESA with the factual basis for its determination that the Turbine System Damage is not covered by the Policy.

### COUNT I
### (Declaratory Judgment Regarding Hanover's Coverage Obligations Under the Policy)

29.    ESA repeats and incorporates by reference the preceding paragraphs regarding these Counterclaims as if fully set forth herein.

30.    On February 18, 2011, by entering into a Building Solutions Subcontract Agreement with Honeywell for the design, construction, installation, and other services for the infrastructure expansion at the Project, the Project qualified as a "project site" covered by the Policy.

31.    At that time, ESA acquired an insurable interest in the G-9 turbine, the IAC-9 Coils, and related equipment located at the Project's site, thus qualifying the G-9 turbine, the IAC-9 Coils, and related equipment as "Covered Property" under the Policy.

32.    The G-9 turbine, the IAC-9 Coils, and related equipment were damaged on or

before May 2014.

33.     The Turbine System Damage took place within the Policy's February 21, 2011 to July 1, 2014 coverage period.

34.     Coverage for the G-9 turbine, the IAC-9 Coils, and related equipment had not ceased or otherwise expired at the time the Turbine System Damage took place.

35.     The Turbine System Damage resulted from a "Covered Cause of Loss" under the Policy.

36.     ESA has complied with all terms and conditions contained in the Policy except to the extent its performance has been or is excused or Hanover has waived, or is estopped from asserting, these terms and conditions.

37.     Hanover contends that ESA's losses are not covered but has failed to satisfy its burden of proving that any exclusions or other coverage limiting language in the Policy applies to bar or limit coverage for all or part of the Turbine System Damage.

38.     Hanover accordingly owes a duty under the Policy to pay for all covered loss arising from the Turbine System Damage.

39.     Hanover has taken the position that it does not owe a duty under the Policy to pay for covered loss arising from the Turbine System Damage.

40.     In light of the above, there exists an actual controversy between the parties appropriate for the entry of a declaratory judgment pursuant to 28 U.S.C. § 2201, in ESA's favor.

41.     ESA is entitled to a declaration that Hanover owes a duty under the Policy to pay for all covered loss caused by the Turbine System Damage.

<u>**COUNT II**</u>
<u>**(Hanover's Breach of Its Obligations Under the Policy)**</u>

42.     ESA repeats and incorporates by reference the preceding paragraphs regarding

these Counterclaims as if fully set forth herein.

43.    On February 18, 2011, by entering into a Building Solutions Subcontract Agreement with Honeywell for the design, construction, installation, and other services for the infrastructure expansion at the Project, the Project qualified as a "project site" covered by the Policy.

44.    At that time, ESA acquired an insurable interest in the G-9 turbine, the IAC-9 Coils, and related equipment located at the Project's site, thus qualifying the G-9 turbine, the IAC-9 Coils, and related equipment as "Covered Property" under the Policy.

45.    The G-9 turbine, the IAC-9 Coils, and related equipment were damaged on or before May 2014.

46.    The Turbine System Damage took place within the Policy's February 21, 2011 to July 1, 2014 coverage period.

47.    Coverage for the G-9 turbine, the IAC-9 Coils, and related equipment had not ceased or otherwise expired at the time the Turbine System Damage took place.

48.    The Turbine System Damage resulted from a "Covered Cause of Loss" under the Policy.

49.    ESA has complied with all terms and conditions contained in the Policy except to the extent its performance has been or is excused or Hanover has waived, or is estopped from asserting, these terms and conditions..

50.    Hanover contends that ESA's losses are not covered but has failed to satisfy its burden of proving that any exclusions or other coverage limiting language in the Policy applies to bar or limit coverage for all or part of the Turbine System Damage.

51.    Hanover accordingly owes a duty under the Policy to pay for covered loss arising

from the Turbine System Damage.

52.     Hanover has taken the position that it does not owe a duty under the Policy to pay for covered loss arising from the Turbine System Damage.

53.     By asserting that there is no coverage under the Policy and refusing to pay, Hanover has materially breached its obligation under the Policy to pay for covered loss arising from the Turbine System Damage.

54.     As a direct and proximate cause of Hanover's breach, Hanover has deprived ESA of the benefit of the Policy for which ESA has paid a substantial premium.

55.     ESA has incurred damages in an amount to be proven at trial, and therefore an award of damages, interest, attorney's fees, costs, and other appropriate relief is warranted.

## ENGINEERED SYSTEMS ALLIANCE, LLC'S CROSSCLAIM AGAINST DEFENDANT HONEYWELL INTERNATIONAL, INC.

Pursuant to Rule 13(g) of the Federal Rules of Civil Procedure, Defendant, Counterclaimant and Cross-Plaintiff Engineered Systems Alliance, LLC ("ESA") files the instant Crossclaim against Defendant, Counterdefendant and Cross-Defendant Honeywell International, Inc. ("Honeywell") and states as follows:

## THE PARTIES

1.     ESA is a limited liability company organized under the laws of the Commonwealth of Virginia and maintains its principal place of business in Alexandria, Virginia.

2.     Upon information and belief, Plaintiff Honeywell is a Delaware corporation with its principal place of business in Morristown, New Jersey.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this crossclaim pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between ESA and Honeywell, which are

citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Honeywell is subject to personal jurisdiction because it regularly transacts business in Maryland.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because the events giving rise to the Cross Claim occurred in Montgomery County, Maryland.  Further, Honeywell has admitted, Paragraph 11 of its Answer and Counterclaim to the Complaint filed by Plaintiff Hanover Insurance Company, that venue is proper in this judicial district.

## THE PROJECT

6.      This dispute arises from a February 18, 2011 subcontract agreement between ESA and Honeywell for the performance of work on the Federal Research Center at White Oak, located at 10903 New Hampshire Avenue, Silver Spring, Maryland 20993.

7.      In or about 2010, the U.S. Food and Drug Administration ("FDA") sought to expand the infrastructure at its Central Utility Plant in Silver Spring, Maryland (the "Project"), which serves as a source of electrical power, chilled water, heating hot water, and steam for the FDA's buildings at its White Oak Federal Research Center.

8.      In order to expand the infrastructure at the Project, in or about 2011, the U.S. General Services Administration ("GSA"), on behalf of the FDA, awarded Task Order DE-AM-09G029035 to Honeywell.  GSA later entered into a contract with Honeywell, whereby Honeywell was to construct and then operate the facility upon completion of the Project.

9.      On or about February 18, 2011, Honeywell entered into a Subcontract Agreement with ESA for the design, construction, installation, and other services for the infrastructure expansion at the Project (the "Subcontract").  A true and correct copy of the Subcontract is

attached hereto as Exhibit A.[1]

## G-9 TURBINE AND ASSOCIATED INLET AIR COOLING ISSUES

10.     ESA's scope of work for the Project included, among other things, tasks associated with installation of two duel fuel turbine-generators (7.5 MW each) (the "G-7 and G-8 Turbines") and one natural gas turbine generator (4.5 MW) (the "G-9 Turbine"), each procured by Honeywell from Solar Turbines, Inc. (collectively, the "turbines").

11.     ESA's scope of work for the Project also included the installation of the inlet air cooling coils (the "IAC Coils") procured by Honeywell for the Project.

12.     ESA received, set and installed the turbines and their respective IAC Coils, but was not responsible for their design or for any design deficiencies of those components.

13.     The IAC Coils consist of a chilling system for gas turbine inlet air, located in the ductwork that brings outside air into the turbine when it is running for combustion purposes.

14.     The sole purpose of the IAC Coils is to cool combustion air on warm days to increase the efficiency of the turbines.  More specifically, with inlet air cooling, a gas turbine will have a higher mass flow rate and pressure ratio, yielding an increase in turbine output and efficiency.

15.     On such days, when the outside ambient temperatures are warm, automatic valves are opened on the supply and return piping serving those IAC Coils to allow chilled water to flow through the IAC Coils, which then cools the air flowing across the IAC Coils on its way to the turbines.

16.     In early November 2013, it was determined by Honeywell and/or its agents that, with cold weather and sub-freezing temperatures in the forecast, the IAC Coils for the G-9

---

[1] All capitalized or defined terms shall have the definitions ascribed to them in the Subcontract.

Turbine (the "IAC-9 Coils") should be winterized by draining the water out of them in order to prevent them from suffering any freeze damage.  At that time, the G-9 Turbine was functional, in the custody of Honeywell, in beneficial use, and being operated by Honeywell to generate power.  Accordingly, the IAC-9 Coils were drained of water on or about November 11, 2013.

17.    ESA properly drained the IAC-9 Coils of water in compliance with the manufacturers' winterization protocol.

18.    On or about September 23, 2013, Honeywell and/or its agents directed a new sequence of freeze protection for the IAC-9 Coils serving the G-9 Turbine ("Honeywell Freeze Protection Scheme").

19.    The Honeywell Freeze Protection Scheme, when activated, would cause the automatic chilled water supply and return valves serving the IAC-9 Coils to go to a fully open position whenever the outside air temperature approached freezing.

20.    The Honeywell Freeze Protection Scheme was contradictory to the manufacturers' winterization protocol and prudent industry practices.

21.    Following the draining of the IAC-9 Coils, on or about November 12, 2013, the Trending Reports (which record the positions of the chilled water valves serving the IAC-9 Coils) indicated that the Honeywell Freeze Protection Scheme was activated by Honeywell and/or its agents.  Those Trending Reports show that the automatic valves were repeatedly opening and closing over the winter of 2013/2014 whenever outside ambient temperatures approached or fell below freezing.

22.    On December 31, 2013, Honeywell notified the FDA that the Project was substantially complete, and the FDA accepted substantial completion of the Project on January 9, 2014.

23.     On information and belief, sometime during the winter of 2013-2014, after the IAC-9 Coils had been winterized by ESA on November 11, 2013, water was introduced by Honeywell and/or its agents into the IAC-9 Coils, that water eventually froze, and damaged the IAC-9 Coils.

24.     On or about May 12, 2014, Honeywell, and/or its agents, improperly introduced pressurized water into the IAC-9 Coils serving the G-9 Turbine, causing a large volume of water to be emitted from cracks in both the upper and lower portions of the IAC-9 Coils.  As a result, a large volume of pressurized water entered the engine compartment of the G-9 Turbine.

25.     When Honeywell and/or its agents opened the automatic valves to activate the IAC-9 Coils by circulating chilled water through them, they did so while the G-9 Turbine was running.  In doing this, Honeywell and/or its agents took no precautions or other actions to check and to verify the integrity of the IAC-9 Coils, to ensure they had not suffered any damage over the winter months when they were not in operation.

26.     The failure of Honeywell and/or its agents to check the IAC-9 Coils before activating them was contrary to applicable standards for operation and maintenance for the G-9 Turbine.

27.     On May 12, 2014 when the IAC-9 Coils were pressurized with water, it was done while the G-9 Turbine was running and damage was exacerbated when a large volume of water was drawn into the engine.

28.     Honeywell's conduct in activating the IAC-9 coils before making appropriate inquiries, amounts to both negligence and willful misconduct, and a breach of Honeywell's express and implied obligations under the Subcontract.

29.     On April 18, 2016, Honeywell notified ESA that it terminated ESA's right to complete any further work under the Subcontract.  A true and correct copy of Honeywell's April 18, 2016 letter is attached hereto as Exhibit B.

30.     On April 27, 2016, ESA responded to Honeywell's termination notice.  A true and correct copy of ESA's April 27, 2016 letter is attached hereto as Exhibit C.

31.     All conditions precedent to bringing of this lawsuit have been satisfied or waived.

## COUNT I
### (Breach of Contract for Honeywell's Failure to Tender Contract Balance)

32.     ESA repeats and incorporates by reference the preceding paragraphs of this Crossclaim as if fully set forth herein.

33.     The Subcontract Price for work performed under the Subcontract and related change orders was $101,053,176.00.

34.     As of the filing of this Crossclaim, Honeywell has paid ESA $99,598,052.00, leaving an unpaid balance of $1,455,124.00.

35.     With the exception of any conditions that have been waived or relinquished by Honeywell's conduct, ESA has fully complied with all of the terms and conditions in the Subcontract and satisfied all conditions precedent, entitling it to receive full payment of the Subcontract Price including, but not limited to, change orders.

36.     Honeywell breached the Subcontract by failing to pay ESA in accordance with its terms and conditions, including, but not limited to, Article 13.

37.     As a direct and proximate result of Honeywell's actions and omissions, ESA has incurred damages and will continue to incur damages.

<u>COUNT II</u>
<u>(Breach of Contract for Honeywell's Wrongful Termination for Default)</u>

38.     ESA repeats and incorporates by reference the preceding paragraphs of this Crossclaim as if fully set forth herein.

39.     On April 18, 2016, Honeywell terminated ESA for default, alleging that ESA "failed to (i) perform the Subcontract Work properly, (ii) protect the Subcontract Work after installation and before acceptance, (iii) implement appropriate safety measures pertaining to the Subcontract Work and the Project, (iv) timely and promptly correct the non-conforming defective Subcontract Work, (v) indemnify Honeywell, and (vi) remedy any loss or damage caused by the Subcontract Work that is not covered by insurance."

40.     ESA denies Honeywell's allegations of default; ESA properly performed under the Subcontract including, without limitation, Subcontract Sections 7.7, 9.13 and 9.15.

41.     As a result of Honeywell's beneficial use of the Subcontract Work, as well as its representations to the Government regarding substantial completion, Honeywell assumed full responsibility for protecting the portions of the Work that suffered damage caused by Honeywell and/or its agents.  Subcontract Section 7.7 states, in pertinent part:

> Subcontractor will promptly repair or replace any Subcontract Work damaged prior to final acceptance by Honeywell, at no additional cost; provided, however, that after any portion of the Subcontract Work is accepted by Honeywell or Owner or is beneficially used by Honeywell or Owner, Subcontractor assumes full responsibility only for damage to such portion of the Subcontract Work that is caused by Subcontractor or those for whom Subcontractor is responsible.

42.     Honeywell was beneficially using the G-9 Turbine when its acts and omissions caused damage to the IAC-9 Coils and G-9 Turbine and, therefore, Honeywell is responsible for all damages to the IAC-9 Coils and G-9 Turbine.

43.     ESA did not cause the damage to the IAC-9 Coils and G-9 Turbine.  Accordingly,

ESA was not responsible to repair or replace the IAC-9 Coils and G-9 Turbine.

44.     On or about January, 2015, ESA and Honeywell entered an agreement related to the replacement of the IAC-9 Coils.  The agreement expressly reserved the rights and defenses of ESA and Honeywell.

45.     On or about April 23, 2015, ESA satisfactorily completed the agreed upon replacement of the damaged IAC-9 Coils.

46.     Thereafter, ESA complied with measures to pursue coverage under the Hanover Insurance Company builder's risk policy furnished under the terms of the Subcontract. Honeywell has affirmatively represented that damages to the IAC-9 Coils and G-9 Turbine satisfy all preconditions for coverage under the policy.

47.     ESA did not materially breach the Subcontract as stated in the April 18, 2016 termination notice, nor did ESA fail to perform or protect the Work as required by the Subcontract, cause the damage to the IAC-9 Coils and G-9 Turbine, and ESA did not fail to "remedy any loss or damage caused by the Subcontract Work that is not covered by insurance" as Honeywell claimed in its April 18, 2016 termination notice.

48.     Honeywell therefore wrongfully terminated ESA for default.

49.     The Subcontract provides that a wrongful termination for default shall be deemed to have been made without cause pursuant to Subcontract Section 14.2

50.     Subcontract Section 14.2 states:

> Honeywell may terminate this Subcontract at any time without cause.  If this Subcontract is terminated by Honeywell without cause and prior to completion, Honeywell's sole liability to Subcontractor will be limited to (i) those costs and expenses incurred by Subcontractor at or prior to the time of termination in peforming [sic] the Subcontract Work (including any reasonable and customary costs incurred to terminate subcontracts and purchase orders), to the extent that such costs and expenses are reasonably substantiated as being consistent with the Progress Schedule and are supported by reasonable and sufficient back-up data

and documentation (such as invoices and payroll records) substantiating Subcontractor's right to payment, plus (ii) related overhead and profits as set forth on Exhibit 5. Honeywell will have the right to ownership and possession of all materials paid for under this Subcontract. Under no circumstances will the Subcontractor be entitled to recover lost profits or any damages from Honeywell as a result of early termination other than as set forth in this Section 14.2, nor will Subcontractor be entitled to any claim or lien against Honeywell or Customer.

51.     Honeywell is thus liable to ESA for all costs and expenses incurred by ESA in performing the Subcontract Work (including any reasonable and customary costs incurred to terminate subcontracts and purchase orders), plus related overhead and profits as set forth in the Subcontract.

52.     As a direct and proximate result of Honeywell's actions and inactions, ESA has incurred damages, and will continue to incur damages, in an amount to be proven at trial.

## COUNT III
### (Indemnification)

53.     ESA repeats and incorporates by reference the preceding paragraphs of this Crossclaim as if fully set forth herein.

54.     Pursuant to Subcontract Section 11.2, Honeywell must, at its expense, defend, hold harmless and indemnify ESA and its subsidiaries, affiliates, agents, and subcontractors and their respective officers, directors, shareholders and employees from and against "any and all loss, cost, expense, damage, claim, demand, or liability, including reasonable attorney and professional fees and costs, and the cost of settlement, compromise, judgment, or verdict incurred by or demanded of an Indemnitee . . . to the extent arising out of, resulting from or occurring in connection with . . . Honeywell's negligence, willful misconduct, or breach of the terms of [the] Subcontract . . ."

55.     Subcontract Section 11.2 further provides that "All Subcontractor remedies set forth in this Subcontract are in addition to, and will in no way limit, any other rights and

remedies that may be available to Subcontractor at law or in equity."

56.     Honeywell breached the Subcontract by, among other things, failing to pay ESA the balance of the Subcontract Price, causing damage to the IAC-9 Coils and G-9 Turbine, wrongfully initiating a lawsuit against Pierce Associates, Inc. and Hankins & Anderson, Inc., and wrongfully terminating ESA.

57.     Honeywell must therefore defend, hold harmless and indemnify ESA and its affiliates, agents and subcontractors and their respective officers, directors, shareholders, and employees from all loss, cost, expense, damage or other liability, including reasonable attorney and professional fees and costs, and the cost of settlement, compromise, judgment, or verdict, including, but not limited to, those claims asserted against Pierce Associates, Inc. and Hankins & Anderson, Inc., and those claims asserted against ESA by Honeywell, Hanover and GSA, in accordance with Subcontract Section 11.2.

58.     ESA has incurred damages in an amount to be proven at trial, and therefore an award of damages, interest, attorney's fees, costs, and all other appropriate relief is warranted.

### PRAYER FOR RELIEF

WHEREFORE, ESA respectfully seeks the following:

A.     That the Court enter judgment in favor of ESA on all causes of action;

B.     On ESA's First Cause of Action in its Counterclaim, a declaration that Hanover owes a duty under the Policy to pay for all damage to the G-9 turbine, the IAC-9 Coil, and related equipment caused by the Turbine System Damage;

C.     On ESA's Second Cause of Action in its Counterclaim, an award of damages in ESA's favor in an amount to be determined at trial;

D.     On all causes of action for ESA's Crossclaim, an award of damages in ESA's

favor in an amount to be determined at trial, but not less than $3 million;

      E.      On all claims for relief, an award of ESA's reasonable attorneys' fees;

      F.      On all claims for relief, an award of pre-judgment and post-judgment interest, costs, and expenses of this action;

      G.      On all claims for relief, for such other, further, and different relief as this Court deems is just and proper; and

      H.      That this case be tried by a jury on all claims and defenses.

This the 28th day of April 2016.

              **ENGINEERED SYSTEMS ALLIANCE, LLC**

              /s/ Jeffrey G. Gilmore

              Jeffrey G. Gilmore
              **AKERMAN LLP**
              750 Ninth Street, N.W., Suite 750
              Washington, DC 20001
              Telephone: (202) 393-6222
              Facsimile: (202) 393-5959
              jeff.gilmore@akerman.com

              /s/ Barry J. Fleishman

              Barry J. Fleishman (Md. Bar No. 15869)
              Gregory M. Jacobs (Md. Bar No. 18512)
              **KILPATRICK TOWNSEND & STOCKTON LLP**
              607 14th Street, N.W., Suite 900
               Washington, DC 20005-2018
              Telephone: (202) 508-5835
              Facsimile: (202) 585-0003
              bfleishman@kilpatricktownsend.com
              gjacobs@kilpatricktownsend.com

              *Attorneys for Defendant and Counter-claimant Engineered System Alliance, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of April, 2016, a true and correct copy of the foregoing was served electronically by the Court's CM/ECF system that will serve a true and correct copy on the following:

Jeffrey A. Wothers
NILES BARTON AND WILMER LLP
111 S Calvert Street, Suite 1400
Baltimore, MD 21202
Telephone: (410) 783-6300
Fax: (410) 783-6363
jawothers@niles-law.com
*Counsel for Hanover Insurance Company*

Seth A. Robbins
STINSON LEONARD STREET LLP
1775 Pennsylvania Avenue, N.W., Suite 800
Washington, DC 20006
Telephone: (202) 728-3002
Fax: (202) 572-9957
srobbins@stinson.com
*Counsel for Honeywell International, Inc.*

Barry J. Fleishman
Gregory Matthew Jacobs
KILPATRICK TOWNSEND AND STOCKTON LLP
607 14th Street N.W., Suite 900
Washington, DC 20002
Telephone: (202) 508-5851
Fax: (202) 585-0041
gjacobs@kilpatricktownsend.com
bfleishman@kilpatricktownsend.com
*Counsel for Engineered Systems Alliance, LLC*

Lauren P. McLaughlin
Shannon J. Briglia
BRIGLIA MCLAUGHLIN PLLC
1950 Old Gallows Road, Suite 750
Vienna, VA 22182
Telephone: (703) 506-1990
Fax: (703) 506-1990
lmclaughlin@briglialaw.com
sbriglia@briglialaw.com
*Counsel for Pierce Associates, Inc.*

Tracy A. Saxe
SAXE DOERNBERGER AND VITA, P.C.
35 Nutmeg Drive, Suite 140
Trumbull, CT 06611
Telephone: (203) 287-2100
Fax: (203) 287-8847
tas@sdvlaw.com
*Counsel for Honeywell International, Inc.*

Celia B. Keniry
SAXE DOERNBERGER AND VITA, P.C.
1952 Whitney Avenue
Hamden, CT 06517
Telephone: (203) 287-2100
Fax: (203) 287-8847
cbk@sdvlaw.com
*Counsel for Honeywell International, Inc.*

Jonathan C. Shoemaker
Joseph W Cooch
LEE & MCSHANE, P.C.
1211 Connecticut Avenue, N.W., Suite 425
Washington, DC 20036
Telephone: (202) 530-8100
Fax: (202) 530-0402
jcs@lee-mcshane.com
jwc@lee-mcshane.com
*Counsel for Hankins & Anderson, Inc.*

William R. Mauck, Jr.
SPOTTS FAIN
411 East Franklin Street, Suite 600
Richmond, VA 23219
Telephone: (804) 697-2061
Fax: (804) 697-2161
bmauck@spottsfain.com
*Counsel for Hankins & Anderson, Inc.*

/s/ Jeffrey G. Gilmore
Jeffrey G. Gilmore

28