**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

THE HANOVER INSURANCE COMPANY,    *

     Plaintiff,                        *

    v.                             *         Civil Action No. 8:15-cv-00112-PX

                                   Civil Action No. 8:16-cv-00050-GJH

ENGINEERED SYSTEMS ALLIANCE,    *          (consolidated)
LLC, *et al.*,

                                *

     Defendants.                *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

HANKINS AND ANDERSON, INC.,    *

     Third-Party Plaintiff,        *

    v.                             *

THERMO SYSTEMS, LLC,          *

     Third-Party Defendant.      *

                                  *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

PIERCE ASSOCIATES, INC.,         *

     Third-Party Plaintiff,        *

    v.                             *

CLEAVER-BROOKS, INC., *et al.*,    *

     Third-Party Defendants.      *

                                 ***

## <u>MEMORANDUM OPINION</u>

Pending in this complex construction case are the following dispositive motions filed by subcontractor Third-Party Defendants: (1) Elliott Co. I d/b/a Elliott Co. ("Elliott"), Cleaver-Brooks, Inc. ("Cleaver-Brooks"), IA Manufacturing, LLC d/b/a Industrial Steam ("Industrial Steam"), Rentech Boiler Systems, Inc. ("Rentech"), and Tate Engineering Systems, Inc. ("Tate")

moved to dismiss the third-party Complaints filed by Pierce Associates, Inc. ("Pierce") (ECF

Nos. 358, 359, 361, 362, 363)[1]; (2) ValvTechnologies, Inc. ("ValvTech") moved for summary

judgment against Pierce (ECF No. 360); (3) Elliott moved to dismiss the third-party Complaint

filed by Engineered Systems Alliance, LLC ("ESA") (ECF No. 357); and (4) Thermo Systems,

LLC ("Thermo") moved to dismiss part of the third-party Complaint filed by Hankins and

Anderson, Inc. ("H&A"). ECF No. 244.[2] The motions are fully briefed, and no hearing is

necessary. *See* Loc. R. 105.6. For the following reasons, the Court GRANTS Third-Party

Defendants' motions. ECF Nos. 244, 357, 358, 359, 360, 361, 362, 363.

## I. Factual Background

In 2010, the United States General Services Administration ("GSA") entered into a

contract with Honeywell International, Inc. ("Honeywell") to design and build a central utility

plant. ECF No. 283 ¶ 9. The central utility plant provides electricity, steam, and water to a

federal facility in Maryland, in part through turbine generators. The failure of the G-9 and G-12

turbines and related equipment form the basis of this and other lawsuits. *Id.* ¶ 32.

Honeywell hired ESA to provide "the design, construction, installation, and other

services for the infrastructure" of the plant. *Id.* ¶ 10. In the Honeywell-ESA contract, the parties

included a mutual indemnity clause for losses caused by the other's negligence, willful

misconduct, or breach of contract. ECF No. 183-1, art. 11.1–11.2. ESA then contracted with

Pierce, a member of ESA, for Pierce to provide the mechanical and plumbing systems for the

project. ECF No. 283 ¶ 11. The Pierce-ESA subcontract stated that "the terms and conditions of

---

[1] Unless otherwise noted, citations to the docket refer to Case Number 8:15-cv-00112-PX.

[2] Also pending are numerous other dispositive motions and attendant motions to seal, which are not addressed in this Memorandum Opinion. *See* ECF Nos. 345, 387, 413, 414, 417, 432, 435, 438, 442, 445; *see also* ECF Nos. 59, 61, 63, *Honeywell Int'l, Inc. v. Liberty Mut. Ins. Co.*, No. 8:16-cv-01430-PX.

ESA's contract with Honeywell Corporation are incorporated by reference as applicable to Pierce Associates [sic] scope of work."  ECF No. 382-2 at 1 (original in all capital letters).

Pierce then procured equipment and services from Third-Party Defendants to design and build the G-12 and other machinery as follows:  Elliott designed and furnished a steam turbine generator package that included a lube and control oil system, a trip and throttle valve to control steam flow, spare parts, labor, and support for a functional performance test.  ECF No. 283 ¶ 12. The contract specifications required Elliott to provide data for the generator's routine maintenance and overhaul.  *Id.* ¶ 18.  ValvTech furnished valves, actuators, documentation, and labor for startup, training, and revision of a feed water connection.  ECF No. 202 ¶ 12.  Cleaver-Brooks designed and manufactured a fire tube boiler, valves, a surface blowdown system, and provided the labor to install, startup, and test a steam boiler.  ECF No. 295 ¶ 13.  Industrial Steam and Tate collaborated with ESA member, H&A, to design, build, install, and provide start up services for deaerators.  ECF No. 341 ¶¶ 13, 14.  Rentech designed and furnished the heat recovery steam generator systems, stacks and valves, and provided startup services and reworking for a superheater.  ECF No. 330 ¶ 13.  Several of these subcontractors claimed to have substantial training and experience in their respective roles.  *See* ECF No. 283 ¶ 20 (Elliott attesting to "high-quality management standards, accreditations, licensures, and [an] 'unwavering goal to achieve zero incidents of any kind'"); ECF No. 295 ¶ 17 ( "Cleaver-Brooks' reputation and alleged experience and commitment to providing the most advanced, integrated engineered boiler room solutions"); ECF No. 330 ¶ 17 (averring "Rentech's reputation and alleged experience and leadership").

Work Flow Chart[3]



Pierce's Purchase Orders for the above work formed the basis of the contracts between

Pierce and Third-Party Defendants. These Purchase Orders incorporate by reference external

documents, including job specifications. By the terms of the Purchase Orders, Third-Party

Defendants agreed to perform in "strict accordance" with applicable specifications. ECF No.

283 ¶ 16; ECF No. 293 ¶ 18; ECF No. 202 ¶ 13; ECF No. 295 ¶ 14; ECF No. 330 ¶ 14; ECF No.

342 ¶ 29; ECF No. 341 ¶ 21.[4] External specifications for each Third-Party Defendant, except

ValvTech, refer to the "[d]rawings and general provisions of the Contract, including General and

Supplementary Conditions." ECF No. 283 ¶ 16 (Elliott); ECF No. 295 ¶ 15 (Cleaver-Brooks);

---

[3] The dashed line represents the dispute between the parties over whether there was a direct relationship between ESA and Elliott.

[4] While several of these Purchase Orders were attached only to the original third-party complaints, which have been superseded by amended versions, the Court may consider the Purchase Orders as the amended complaints rely upon them, the Purchase Orders are integral to the amended complaints, and no party disputes their authenticity. *See Zak v. Chelsea Therapeutics, Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015).

ECF No. 209-2 at 1 (Industrial Steam); ECF No. 208-2 at 1 (Tate); ECF No. 330 ¶ 15 (Rentech); *see also* ECF No. 330 ¶ 16 (Rentech) (averring, in addition, a reference to "the Contract, including General and Supplementary Conditions"). The Purchase Orders also require each to act in strict "accordance with applicable contract documents." ECF No. 283-1 at 43 (Elliott); ECF No. 202-1 at 1 (ValvTech); ECF No. 330 ¶ 14 (Rentech); *see also* ECF No. 209-1 at 1 (Industrial Steam) (requiring strict compliance "with applicable contract plans and specifications"); ECF No. 208-1 at 1 (Tate) (same); ECF No. 200-1 at 1 (Cleaver-Brooks) (same). Finally, each Purchase Order included indemnification provisions for patent infringements but for no other wrongdoing or losses. ECF No. 202-1 at 2; ECF No. 361-2 at 2; ECF No. 208-1 at 2; ECF No. 209-1 at 2; ECF No. 204-1 at 2; ECF No. 206-1 at 3.

After the work was substantially completed, Honeywell identified an array of design and construction defects of the high-pressure feed water system, the turbine bypass valve assembly, the cooling tower basin retaining wall, the G-12 Turbine system, and an underground pipe installation. ECF No. 141. The defective work, Honeywell contends, has forced the plant to run back-up generators to provide sufficient power and spinning reserve, which has led to Honeywell's "failure to meet performance guarantees that have been made to GSA." *Id.* at ¶ 27.

## II. Procedural Background

Although the current motions concern damages for a wide range of equipment, the original suit related solely to damages sustained to the G-9 turbine after the G-9 failed catastrophically in 2014. ECF No. 197 ¶ 19. On January 14, 2015, Plaintiff Hanover Insurance Company initiated suit, seeking a declaration as to the scope of insurance coverage related to claims on its policy for the G-9 damages. ECF No. 1. Honeywell, in turn, filed crossclaims against ESA as to liability for the G-9 damage (ECF No. 56), which prompted ESA to file a

third-party Complaint against Thermo, seeking indemnity for any G-9 related damages (hereinafter "G-9 Litigation" or "G-9 Claims").  ECF No. 64.

The Court issued a scheduling order for the G-9 Litigation, which required amendment of pleadings or joinder of additional parties by no later than February 6, 2017.  ECF No. 90 at 3. Pursuant to that Order, Honeywell sought leave to amend its crossclaims against ESA, asserting claims for additional defective work performed in connection with the Honeywell-ESA contract. ECF No. 96.  Honeywell's new claims covered a high pressure feed water system, deaerator tank valves and piping, steam vent valves, turbine bypass valve assembly, cooling tower basin retaining wall, underground pipe, and G-12 turbine system (altogether, and excluding the G-9 Claims, hereinafter "G-12 Litigation" or "G-12 Claims").  ECF No. 141 ¶ 24.  Accordingly, the Court granted amendment to allow Honeywell to preserve the G-12 Claims against ESA, Pierce, and H&A.  ECF Nos. 140–42.  H&A, in response, filed a third-party Complaint against Thermo, asserting not only G-12 Claims but also claims related to the G-9 Litigation.  ECF No. 197 ¶¶ 15–22, 32.

As to the G-12 Claims, ESA and Pierce then filed third-party Complaints against Elliott, Cleaver-Brooks, Industrial Steam, Rentech, Tate, and ValvTech.  ECF Nos. 202, 283, 293, 295, 330, 341, 342.  In each third-party Complaint, ESA and Pierce contend that Third-Party Defendants must indemnify ESA and Pierce pursuant to their respective agreements for any liability arising from the G-12 claims.  ESA also avers that Elliott owes contribution to ESA.

Pending before the Court are Third-Party Defendant ValvTech's motion for summary judgment and the remaining Third-Party Defendants' motions to dismiss the indemnity and contribution claims against them.  All essentially argue that ESA and Pierce do not retain any right to indemnification as a matter of law.  Also pending is Thermo's motion to dismiss or strike

H&A's G-9 Claims as untimely. ECF No. 244. The Court first addresses the sufficiency of the indemnity and contribution claims, then turns to Thermo's motion to dismiss.

## III.    Standard of Review

A motion to dismiss brought pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555).

In ruling on a motion to dismiss, the well-pleaded allegations are accepted as true and viewed in the light most favorable to the party asserting the claim. *Twombly*, 550 U.S. at 555. The Court may also consider documents attached to the motion to dismiss when "integral to and explicitly relied on in the complaint, and when the [opposing parties] do not challenge the document[s'] authenticity." *Zak v. Chelsea Therapeutics, Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)) (internal quotation marks omitted). However, "[f]actual allegations must be enough to raise a right to relief above a speculative level." *Twombly*, 550 U.S. at 555. "[C]onclusory statements or a 'formulaic recitation of the elements of a cause of action will not [suffice].'" *EEOC v. Performance Food Grp., Inc.*, 16 F. Supp. 3d 584, 588 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "'[N]aked assertions of wrongdoing necessitate some 'factual

enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557).

As to ValvTech's summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party to determine whether any disputed issue of material fact precludes entering judgment in the movant's favor as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)).

## IV.    Analysis

### A.    Express Indemnity

Pierce argues that the motions must be denied because the Third-Party Defendants'[5] contract documents incorporate the indemnity provision in the Honeywell-ESA contract. ESA makes the same claim as to Elliott. When construing the contracts most favorably to non-movants, the Court cannot agree.

Maryland common law governs the scope and validity of indemnity agreements. *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 300 (2004) (holding that express indemnity agreements "must be construed in accordance with our traditional rules of objective contract interpretation"); *see also Sokolowski v. Flanzer*, 769 F.2d 975, 977 (4th Cir. 1985) (noting that federal courts sitting in diversity must apply the conflict of laws rules of the forum

---

[5] Pierce does not claim that ValvTech expressly agreed to indemnify Pierce. ECF No. 202.

state); *Cunningham v. Feinberg*, 441 Md. 310, 326 (2015) (noting that Maryland applies "the law of the jurisdiction where the contract was made" unless there is a choice of law provision in the contract). Under Maryland law, contracts are interpreted objectively "from the perspective of a reasonable person standing in the parties' shoes at the time of the contract's formation." *Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 86 (2010). The meaning of a contractual indemnity provision is "ordinarily a question of law for the court." *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 250 (2001). The court must "give effect to the plain meaning of an unambiguous term," *Weichert Co. of Md., Inc. v. Faust*, 419 Md. 306, 324 (2011), by looking to "the customary, ordinary, and accepted meaning of the language used." *Bainbridge St. Elmo Bethesda Apartments, LLC v. White Flint Express Realty Grp. Ltd. P'ship, LLLP*, 454 Md. 475, 485 (2017) (quoting *Ulico*, 380 Md. at 301) (internal quotation marks omitted). The court considers the "entire language of the agreement, not merely a portion thereof." *Bainbridge*, 454 Md. at 486 (quoting *Jones v. Hubbard*, 356 Md. 513, 534 (1999)) (internal quotation marks omitted). Additionally, "[u]nder Maryland law, the parties to a contract may voluntarily agree to define their contractual rights and obligations by reference to documents or rules external to the contract." *Patton v. Wells Fargo Fin. Md., Inc.*, 437 Md. 83, 109 (2014).

The operative contracts governing Third-Party Defendants are plainly the Purchase Orders. ECF No. 202-1 at 2; ECF No. 208-1 at 2; ECF No. 209-1 at 2; ECF No. 204-1 at 2; ECF No. 206-1 at 3. Each Purchase Order expressly states, on every page, that "[w]e acknowledge receipt of this order and hereby certify that the terms and conditions set forth herein constitute our <u>entire agreement</u>." *See, e.g.*, ECF No. 202-1 at 2 (emphasis added) (original in all capital letters). Each Purchase Order also includes an identical indemnity provision, which states:

> PATENTS: The Seller agrees to indemnify and save harmless the
> Buyer, against all actions, claims or demands that may be made or

> brought against the Buyer, and against all damages, costs and expenses, including attorney's fees, that the Buyer may incur by reason of any claim for infringement of any letters patent arising from the manufacture, sale or use of any of the articles specified in this order.

ECF No. 202-1 at 2 (ValvTech); ECF No. 361-2 at 2 (Cleaver-Brooks); ECF No. 208-1 at 2 (Tate); ECF No. 209-1 at 2 (Industrial Steam); ECF No. 204-1 at 2 (Rentech).[6]

These indemnity provisions are unambiguously limited to patent infringement claims, and so are not implicated in this case. The Purchase Orders do not give rise to any indemnification rights concerning the work performed.

Pierce and ESA contend, as they must, that the Purchase Orders incorporated an upstream contract between Honeywell and ESA that includes a broadly worded indemnity provision. Specifically, Pierce and ESA point to the Purchase Order clause that states, "[P]erformance . . . shall be in strict accordance with applicable contract documents, including Addenda, for the referenced project, and the provisions of 'PARAGRAPH C - STIPULATIONS', attached hereto." ECF No. 204-1 (Rentech); ECF No. 206-1 (Elliott); ECF No. 202 (ValvTech); *see also* ECF No. 200-1 (Cleaver-Brooks); ECF No. 208-1 at 1 (Industrial Steam c/o Tate).[7] Pierce and ESA contend that "the Contract" as referenced in this clause refers to all upstream contracts, including the Honeywell-ESA contract. Thus, because the Honeywell-ESA contract includes an indemnity provision covering breach of contract, Pierce contends that the subcontractors have

---

[6] The Elliott indemnity clause reads slightly differently, but in a manner that does not change the Court's analysis. ECF No. 206-1 at 3 ("**PATENTS**: Elliott shall indemnify Pierce against liability and damages on claims based solely on infringement of any United States Letters Patent arising out of the manufacture or use of any of Elliott's GOODS furnished, provided that Pierce promptly notifies Elliott of any such claim and gives Elliott ample opportunity to defend in its own behalf against such claim.").

[7] The Court recognizes that certain provisions substitute the word "documents" with "plans and specifications," *compare* ECF No. 208-1, *with* ECF No. 206-1, but are otherwise identical. That Pierce uses these words interchangeably reinforces that the plain language of these provisions does not act to incorporate the entire Honeywell-ESA contract into the Purchase Orders, as more fully explained below.

agreed to indemnify Pierce and ESA. ECF No. 382 at 13; ECF No. 383 at 6.

No reading the of the Purchase Orders support ESA and Pierce's claims. The Court notes first that, to the extent the Purchase Orders incorporate outside documents, the Orders expressly state—prominently and in all capital letters—the specific documents expressly incorporated. *See, e.g.* ECF No. 206-1 at 2 ("The following items shall be furnished subject to the terms and conditions on the <u>attached</u> sheet which are <u>incorporated and made a part hereof</u>.") (emphasis added). Significantly, the parties knew how to incorporate documents beyond the Purchase Order into the operative agreement. Yet nowhere do the Purchases Orders reference the Honeywell-ESA contract as incorporated in its entirety, or the indemnity provision specifically. *See Ray v. William G. Eurice & Bros.*, 201 Md. 115, 128 (1952) ("[W]here a writing refers to another document, that other document, *or so much of it as is referred to*, is to be interpreted as part of the writing.") (emphasis added); *cf.* ECF No. 382-2 at 1 (unlike Purchase Orders, plain language of Pierce-ESA contract incorporating Honeywell-ESA contract: "The terms and conditions of ESA's contract with Honeywell Corporation are incorporated by reference as applicable to Pierce Associates [sic] scope of work.") (original in all capital letters).

Rather, construing the operative language most favorably to Pierce and ESA, the Purchase Orders bind the subcontractors to execute their respective "performance" obligations "in strict accordance with applicable contract documents [or plans and specifications]." This clause can only be read to mean the subcontractor will deliver its work consistent with the needs of the project as set out in the documents "for the referenced project." Accordingly, the Court cannot read these Purchase Orders to incorporate the Honeywell-ESA contract's indemnity clause.

Pierce and ESA contend that even if the Purchase Orders do not incorporate the

Honeywell-ESA contract, the external specifications referenced by the Purchase Orders

incorporate the Honeywell-ESA contract. Again, the Court disagrees. Looking first to Industrial

Steam and Tate,[8] the Purchase Order required performance in accordance with specifications

titled "Section 235316 - Deaerators." ECF No. 208-1 at 1, 3; ECF No. 208-2. Section 235316

states, under "Related Documents," that "Drawings and general provisions of the Contract,

including General and Supplementary Conditions and Division 01 Specification Sections, apply

to this Section." ECF No. 208-2 at 1. Although none of these terms are defined, it is clear that

"the Contract" cannot mean the Honeywell-ESA contract. The word "include" means "[t]o

contain as a part of something." *Include*, Black's Law Dictionary (10th ed. 2014). Section

235316 unambiguously refers to a contract that contains "General and Supplementary Conditions

and Division 01 Specification Sections."

However, nowhere in the Honeywell-ESA contract do the phrases "General and

Supplementary Conditions," "General Conditions," "Supplementary Conditions," or "Division

01 Specification Sections" ever appear. ECF No. 183-1. Rather, the Honeywell-ESA contract

includes an article entitled "General Provisions." *Id.*, art. 3. This "General Provisions" section

does not contain "Supplementary" conditions or provisions, nor is the word "supplementary"

found anywhere in the Honeywell-ESA contract. Similarly, the Honeywell-ESA contract does

not refer to "Division 01 Specification Sections." Instead, it refers to distinguishable

specification sections, namely 08710 Hardare and 16724 Analog Addressable Fire Alarm

Systems. *Id.*, ex. 6. Moreover, the Honeywell-ESA contract could not reference the term

"Division 01 Specification Sections" because the project had not yet been divided into its

"various divisions or phases." *Id.* at 13.1.1. Because "the Contract" referred to in the Section

---

[8] Pierce used one Purchase Order for Industrial Steam and Tate. *Compare* ECF No. 208-1, *with* ECF No. 209-1.

235316 *must* contain the referenced information not found in the Honeywell-ESA contract, the term "the Contract" cannot reasonably mean the Honeywell-ESA contract. No reading of these external documents allow incorporation of the Honeywell-ESA indemnity provision into the Industrial Steam and Tate contracts. *See Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *9 (Md. Ct. Spec. App. Feb. 9, 2017) ("As long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference . . . .") (quoting 11 Williston on Contracts § 30:25 (4th ed.)).

Likewise, the specifications referenced in the Purchase Orders for the other Third-Party Defendants do not incorporate the Honeywell-ESA contract. These specifications refer to "the Contract, including General and Supplementary Conditions." ECF No. 330 ¶¶ 15–16; ECF No. 293 ¶ 18; ECF No. 295 ¶ 15. Just as for Tate and Industrial Steam, the specifications refer to language not found in the Honeywell-ESA contract. Thus, the specifications cannot be read to incorporate the Honeywell-ESA contract or, more specifically, its indemnity clause.

Similarly, nothing in the Honeywell-ESA contract suggests that the indemnity provision could apply to Third-Party Defendants. The Honeywell-ESA Contract, read as a whole, unambiguously limits the application of the indemnity clause to Honeywell and ESA. Article 1 of the Contract, entitled "Definition of Subcontract Terms," makes clear that the term "Subcontractor" applies solely to "Engineered Systems Alliance, LLC." ECF No. 183-1, art. 1. Additionally, the Contract refers only to Honeywell and ESA as the indemnitors. *Id*., art. 11.

The Honeywell-ESA indemnity clause (Article 11) reads:

> **11.1** *Subcontractor* will, at its expense, defend, hold harmless and indemnify Honeywell and its subsidiaries, affiliates, and agents and their respective officers, directors, shareholders, and employees, and the Owner (collectively, "**Indemnitees**") from and against any and

all loss, cost, expense, damage, claim, demand, or liability, including reasonable attorney and professional fees and costs, and the cost of settlement, compromise, judgment, or verdict incurred by or demanded of an Indemnitee ("**Loss**") to the extent arising out of, resulting from or occurring in connection with (i) *Subcontractor's* negligence, willful misconduct, or breach of the terms of this Subcontract, or (ii) Honeywell's use of the Instruments of Service in connection with the Project. All Honeywell remedies set forth in this Subcontract are in addition to, and will in no way limit, any other rights and remedies that may be available to Honeywell at law or in equity.

**11.2** Honeywell will, at its expense, defend, hold harmless and indemnify *Subcontractor* and its subsidiaries, affiliates, agents and subcontractors and their respective officers, directors, shareholders, and employees (collectively, "**Indemnitees**") from and against any and all loss, cost, expense, damage, claim, demand, or liability, including reasonable attorney and professional fees and costs, and the cost of settlement, compromise, judgment, or verdict incurred by or demanded of an Indemnitee ("**Loss**") to the extent arising out of, resulting from or occurring in connection with (i) Honeywell's negligence, willful misconduct, or breach of the terms of this Subcontract, or (ii) Honeywell's use of the Instruments of Service other than in connection with the Project. All Subcontractor remedies set forth in this Subcontract are in addition to, and will in no way limit, any other rights and remedies that may be available to Subcontractor at law or in equity.

ECF No. 183-1, art. 11.1–2 (italics added).

Conspicuously absent from the Third-Party Defendants' contracts and the Honeywell-ESA contract is any language that would broaden the definition of "Honeywell" or "Subcontractor" to include Third-Party Defendants. *Cf. Schneider Elec. Bldgs. Critical Sys., Inc. v. W. Sur. Co.*, 454 Md. 698, 709 (2017) (holding that arbitration clause was incorporated by reference but did not "alter the language of that promise to include [the downstream contractor]"); *Bell BCI Co. v. HRGM Corp.*, No. JFM-03-1357, 2004 WL 3222885, at *3 (D. Md. Aug. 6, 2004) (holding that subcontractor was liable where contract *expressly* stated subcontractor would assume "'all obligations, terms, conditions, duties, etc. that [contractor] assumes towards Owner and others' under the Prime Contract"). In the end, having reviewed the

unambiguous provisions in the Purchase Orders, the specifications and other external documents, and the Honeywell-ESA contract, this Court can conceive of no reading that allows the Honeywell-ESA indemnity provision to bind Third-Party Defendants. The indemnity claims against Third-Party Defendants cannot survive on this theory of liability.

### B.    Implied Contractual Right to Indemnity

Pierce alternatively claims that it is entitled to implied-in-fact contractual indemnification by its relationships with Third-Party Defendants. ESA again makes the same claim as to Elliott. Under Maryland law,[9] a right of indemnity implied-in-fact "may arise from a special relationship between the parties, usually contractual in nature, or from a course of conduct." *Pulte Home Corp. v. Parex, Inc.*, 403 Md. 367, 382 (2008). But "not every contractual relationship will produce an implied indemnity." *Id.* Rather, "a contractual right to indemnification will only be implied when there are unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility . . . or when there is a generally recognized special relationship between the parties." *Id.* (quoting *Araujo v. Woods Hole, Martha's Vineyard, Etc.*, 693 F.2d 1, 2–3 (1st Cir. 1982)) (internal quotation marks omitted). Often the special relationship is created by statutory or regulatory obligations. *Int'l Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*, 838 F.2d 124, 127 (4th Cir. 1988) (discussing *Ryan Stevedor. Co. v. Pan-Atl. Steam. Corp.*, 350 U.S. 124, 133–34 (1956)); *Gen. Elec. Co. v. Moretz*, 270 F.2d 780,

---

[9] ValvTech contends that Texas law applies to the question of implied indemnity. ECF No. 360 at 4. The Court need not reach whether Maryland or Texas law applies because dismissal is warranted under either analysis. Texas does not recognize indemnity implied-in-fact except where "one party's liability is purely vicarious." *Astra Oil Co., Inc. v. Diamond Shamrock Refining Co.*, 89 S.W.3d 702, 706 (Tex. App. 2002) (quoting *B&B Auto Supply, Sand Pit & Trucking Co. v. Cent. Freight Lines, Inc.*, 603 S.W.2d 814, 817 (Tex. 1980)) (internal quotation marks omitted). Pierce does not allege in its third-party Complaint that ValvTech's liability is purely vicarious, and instead asserts broadly that "ValvTech is liable to Pierce, in whole *or in part*, for Honeywell's claims." ECF No. 202 ¶ 24 (emphasis added). Nor does Pierce contend that under Texas law, the claim survives. ECF No. 382 at 33 (arguing Texas law is "irrelevant"). Because the Complaint does not aver facts sufficient to find the claim survives under Texas law, the Court need not reach whether Texas law governs.

786 (4th Cir. 1959).

In contrast, "the mere relationship between vendor and vendee does not, of itself, suffice to produce an implied contractual right of indemnification . . . ." *Hanscome v. Perry*, 75 Md. App. 605, 615 (1988). Indeed, courts are reluctant to read an implied contractual indemnity right "'because if the parties desired to create an indemnitor-indemnitee relationship, they could have done so expressly in the contract.'" *Clark Constr. Grp. Inc. v. Allglass Sys., Inc.*, No. DKC2002-1590, 2004 WL 1778862, at *14 (D. Md. Aug. 6, 2004) (quoting *Hanover Ins. Co. v. Corrpro Cos., Inc.*, 312 F. Supp. 2d 816, 821 (E.D. Va. 2004)). Accordingly, absent pleaded facts which, taken most favorably to Pierce and ESA, establish unique circumstances or a special relationship, the claims cannot proceed.

Pierce and ESA argue that a sufficiently special relationship exists with Third-Party Defendants because, as subcontractors, they provided "highly specialized engineering and manufacturing." ECF No. 283 ¶ 22 (ESA-Elliott); *see also* ECF No. 293 ¶ 24 (Pierce-Elliott); ECF No. 295 ¶ 29 (Cleaver-Brooks); ECF No. 341 ¶ 27 (Industrial Steam); ECF No. 342 ¶ 26 (Tate); ECF No. 330 ¶ 30 (Rentech). *But see* ECF No. 202 (ValvTech) (not asserting any specialized engineering or manufacturing). Because of these highly specialized services, Pierce and ESA argue that the rationale of *Roy v. Star Chopper Co.*, 442 F. Supp. 1010 (D.R.I. 1977), *aff'd*, 584 F.2d 1124 (1st Cir. 1978) counsels in favor of finding implied indemnity. *Roy*, however, simply does not reach this case.

In *Roy*, the plaintiff filed suit against the manufacturer of machinery for on-the-job injuries. The manufacturer successfully asserted an implied indemnity claim as to the employer because the employer dictated all design and manufacturing specifications of the machinery and refused to provide the manufacturer with information crucial to implementing proper safety

features. *Id.* at 1020. Further, although the employer promised to install safety devices, the employer failed to do so. Accordingly, the *Roy* Court held that the employer indemnified the manufacturer in fact against the employee's claims. The Court stressed, however, that its holding was "narrowly confined to the unusual allegations and evidence before us" and it did "not decide today whether any one of these factors alone would suffice to find an indemnity contract." *Id.*

Neither ESA or Pierce has pleaded sufficient facts to place this case within striking range of *Roy*. None of the claims, for example, aver that Third-Party Defendants promised, but failed to deliver, critical life-safety features, leading to personal injury. *Cf.* ECF No. 283 ¶ 18–19, 37 (alleging that Elliott failed to provide details necessary for "routine maintenance and overhaul" but not alleging a lack of information about the safety device that may have caused property damage); ECF Nos. 202, 295, 341, 342, 330 (not alleging that other Third-Party Defendants refused to provide information). Although Pierce and ESA aver that Third-Party Defendants designed and assembled specialized machinery, Pierce and ESA have set forth nothing more than typical engineering vendor-vendee relationships, which customarily do not give rise to an implied right to indemnity. *See TransDulles Ctr., Inc. v. USX Corp.*, 976 F.2d 219, 228 (4th Cir. 1992) (finding no implied right to indemnity for design of stormwater drainage system); *Nat'l Labor Coll., Inc. v. Hillier Grp. Architecture N.J., Inc.*, No. DKC 09-1954, 2012 WL 3264959, at *7 (D. Md. Aug. 9, 2012) (finding no implied right to indemnity for mechanical, electrical, and plumbing design of two-story building); *Banker Steel Co. v. Hercules Bolt Co.*, No. 6:10cv00005, 2011 WL 1752224, at *11 (W.D. Va. May 6, 2011) (finding no implied right to indemnity for "plain vanilla Purchase Order" for faulty steel rods that caused building atrium to collapse); *DiMarco Constructors, LLC v. Staunton Plaza, LLC*, No. 5:09CV00001, 2009 WL

2058686, at *3 (W.D. Va. July 14, 2009) (finding no implied right to indemnity for certification of building pad, on which retail building was erected). *But see Sherman Constr. Co. v. NGM Ins. Co.*, No. 3:15-CV-3189-JFA, 2016 WL 4736046, at *3 (D.S.C. Sept. 12, 2016) (finding implied right to indemnity for pre-engineered building components and treating the allegation of a "special relationship" as one of fact, rather than legal conclusion).

The lack of implied indemnity is further supported by the express contractual indemnity provision, which defines the scope of the Third-Party Defendants' indemnity obligations. Pierce and ESA *limited* indemnity, quite plainly, to patent claims. This choice can be fairly understood to mean that ESA and Pierce had not sought indemnity for other types of claims. *Cf. Nat'l Labor Coll., Inc. v. Hillier Grp. Architecture N.J., Inc.*, 739 F. Supp. 2d 821, 831 (D. Md. 2010) ("Any implied common law indemnification scheme would either contradict or add to these clearly defined circumstances in the contract. Therefore, because a claim for common law indemnity would be incongruent with the express provisions, the court must dismiss this claim.") (citing *Cty. Cmm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc*., 358 Md. 83, 96–98 & n.8 (2000); *Franklin v. Morrison*, 350 Md. 144, 154 (1998)). ESA and Pierce give the Court no reason, based on the facts as pleaded, to upset these settled expectations as to the narrow scope of the indemnity provisions. To do otherwise, without more, would put every experienced engineer of specialized machinery at risk of becoming an indemnitor, regardless of the factual context and the contractual language. *See Int'l Surplus Lines*, 838 F.2d at 127 ("There is no such unique element in the relationship . . . . If an implied contract for indemnification were found here, it is possible that every insurance broker would, in effect, become an insurer. Such a result would do violence to existing indemnity law."). When construing the averred facts most favorably to Pierce and ESA, the implied indemnity claims must be dismissed.

### C. Contribution

ESA claims that Elliott owes ESA contribution for any successful G-12 Claims that Honeywell asserts against ESA. ECF No. 283 ¶¶ 54–60. However, because Honeywell does not seek damages for any tort claims as to ESA, no right of contribution lies against Elliott.

Maryland recognizes a right to contribution among "joint tort-feasors." Md. Code, Cts. & Jud. Proc. § 3-1402. Accordingly, "the right to contribution has to sound in tort." *S. Md. Elec. Coop., Inc. v. Booth & Assocs., Inc.*, No. HAR 88-547, 1989 WL 85060, at *2 (D. Md. July 25, 1989). Breaches of contract alone do not give rise to contribution precisely because finding a breach does not render the parties joint tortfeasors. *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md. App. 217, 282 (1996).

Honeywell has asserted only claims against ESA sounding in breach of contract. ECF No. 141 ¶¶ 37–62. Accordingly, even though ESA may claim any liability arises between it and Elliott as "joint tortfeasors," (ECF No. 283 ¶ 60), ESA faces no actual tort liability. Any eventual finding of liability against ESA will not, as a matter of law, trigger a right to contribution from Elliott. This claim must also be dismissed.

### D. H&A's Third-Party Complaint against Thermo

Although the scope of Honeywell's amendments to its claims against H&A added only *G-12* Claims, H&A responded with an amended third-party Complaint against Thermo that included both G-9 and G-12 Claims. H&A's new G-9 Claims against Thermo were filed eighteen months after Honeywell filed its original crossclaims as to the G-9 defective work, and while the parties were thick in the discovery process for the G-9 Litigation. In fact, the Court bifurcated the discovery tracks for the G-9 and G-12 Litigation to account for the distinctly different timelines for each set of claims.

Thermo now seeks to dismiss H&A's amended third-party Complaint as to the G-9

Claims as untimely and without good cause.  ECF No. 244.  It is undisputed that H&A only

retroactively sought leave of court to amend as to the G-9 claims against Thermo, and only in

response to Thermo's motion to dismiss.  ECF No. 253 at 7 n.3.  H&A primarily argues that Rule

14 of the Federal Rules of Civil Procedure, which governs the timing of third-party complaints,

allows amendment in this context even absent leave or good cause.  *Id.* at 6.  In this Court's

view, H&A's argument impermissibly distorts the meaning of Rule 14.

Rule 14 states:

> A defending party may, as third-party plaintiff, serve a summons
> and complaint on a nonparty who is or may be liable to it for all or
> part of the claim against it.  *But the third-party plaintiff must, by
> motion, obtain the court's leave if it files the third-party complaint
> more than 14 days after serving its original answer*.

Fed. R. Civ. P. 14(a)(1) (emphasis added).

H&A asserts that its third-party Complaint as to the G-9 Claims is timely because it was

filed within fourteen days of H&A's "original answer" to Honeywell's amended G-12 claims.

To be sure, courts are far from uniform in their interpretation of Rule 14's timing provisions.

*McDougald v. O.A.R.S. Cos.*, No. 1:04-CV-6057OWW DLB, 2006 WL 997896, at *2 (E.D. Ca.

2006).  Three primary interpretations have emerged:

> Under a "plain language" interpretation, the "original"
> answer is the one that responds to the "original" complaint.  If the
> complaint is amended, subsequent answers would be designated as
> the "Answer to the [First, Second, etc.] Amended Complaint" and
> would not be considered "original." *Cf.* Charles Alan Wright, *et al.,*
> 6 Federal Practice & Procedure § 1454 at 422 (2d ed.1990)
> (characterizing period within 10 days of "original answer" as "early
> in the proceeding").  Under a more nuanced, functional reading, the
> "original answer" can be an answer to an amended complaint, so
> long as the basis for impleader is that which is new, *i.e.,* "original,"
> in the answer to the amended complaint.  *See Ez-Tixz, Inc. v. Hit-
> Tix, Inc.,* 1995 WL 77589 *6-7 (S.D.N.Y. Feb. 27, 1995); *Ahern v.*

> *Gaussoin,* 104 F.R.D. 37, 39 (D.Or.1984); *In re "Agent Orange"*
> *Product Liability Litig.,* 100 F.R.D. 778, 780 (E.D.N.Y.1984).
>
> Finally, one court has reasoned that because an amended complaint which stands alone supplants any prior complaints, such an amended complaint becomes the original complaint and therefore the answer to such amended complaint becomes the "original answer" within the meaning of Rule 14(a). *See Nelson v. Quimby Island Reclamation District Facilities Corp.,* 491 F.Supp. 1364, 1387 (N.D. Cal.1980).

*Id.*

The second, "functional" approach essentially allows filing a third-party complaint as to any new theories of liability set out in an amended claim because the answer to such new theories is indeed "original." Thus, third-party claims based on the *new* liability theories are timely if filed within fourteen days of the amended answer. *Danis Envtl. Indus., Inc. v. Greenville Utils. Comm'n*, No. 4:03-CV-146-H3, 2006 WL 8438537, at *3 (E.D.N.C. Sept. 21, 2006). However, third-party claims based on old theories already pleaded will not generally be considered timely under Rule 14. This approach is "adopted by most courts" and "is most in keeping with the intent of the rule." *F.T.C. v. Capital City Mortg. Corp.*, 186 F.R.D. 245, 247 (D.D.C. 1999).

Rule 14 is designed "to give the defendant an incentive to implead the third person seasonably." *In re Agent Orange Prod. Liab. Litig.*, 100 F.R.D. 778, 780 (E.D.N.Y. 1984), *overruled on other grounds*, 635 F.2d 987 (1980) (quoting *Nelson v. Quimby Island Reclamation Dist. Facilities Corp.*, 491 F. Supp. 1364, 1387 (N.D. Cal. 1980)). The Court endeavors to construe the Rules "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. The Court cannot agree that Rule 14 permits filing third-party claims related to old claims simply because separate theories of liability are added, and regardless of the procedural posture of the case. To permit such amendments would invite delay

and "seemingly endless complications" in the litigation.  *See Lester v. SMC Transp., LLC*, No. 7:15CV00665, 2016 WL 4595696, at *10 (W.D. Va. Sept. 2, 2016) (quoting *Noland Co. v. Graver Tank & Mfg. Co.*, 301 F.2d 43, 50 (4th Cir. 1962)).

Honeywell's initial claims centered solely on the G-9 defects.  ECF No. 2, Docket No. 8:16-cv-00050-GJH.  H&A's initial answer as to the G-9 Claims, filed on January 21, 2016, was the "original" answer as to the G-9 Claims.  ECF No. 30, Docket No. 8:16-cv-00050-GJH; ECF Nos. 140, 142.  Under Rule 14, any third-party claims as to the G-9 defects had to be filed fourteen days after such answer or be filed with leave of court.  Thus, when Honeywell amended to bring the G-12 Claims, H&A's subsequent amended answer was "original," but only as to the new G-12 Claims.  *See Danis Envtl.*, 2006 WL 8438537, at *3 ("A timely filed third-party complaint arising solely out of [the new] causes of action would have been proper under Rule 14(a).").  Thus, this Court will not permit amendment as to the G-9 Claims absent a showing of good cause.

Although Rule 15 of the Federal Rules of Civil Procedure directs courts to allow amendment of pleadings freely "when justice so requires," a party must first demonstrate good cause under Rule 16 of the Federal Rules of Civil Procedure for the Court to allow amendment that would alter scheduling order deadlines.  *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008); *Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 373 (D. Md. 2002).  "'[G]ood cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."  *Dilmar Oil Company, Inc. v. Federated Mutual Insurance Company*, 986 F. Supp. 959, 980 (D.S.C. 1997), *aff'd by unpublished opinion*, 129 F.3d 116 (4th Cir. 1997) (table).  "Lack of diligence and carelessness are the 'hallmarks of failure to meet the good cause standard.'"  *Innovative Therapies, Inc. v. Meents*, 302 F.R.D. 364, 382 (D. Md. 2014) (quoting *W.Va. Hous. Dev. Fund*

*v. Ocwen Tech. Xchange, Inc.*, 200 F.R.D. 564, 567 (S.D. W.Va. 2001)).

H&A has not demonstrated good cause for this Court to allow amendment of its third-party Complaint against Thermo for G-9 Claims. H&A has been involved in the G-9 litigation from its inception in January 2015, as both a member and guarantor of ESA. ECF No. 1. H&A has also faced G-9 Claims directly since January 7, 2016. ECF No. 2, Docket No. 8:16-cv-00050-GJH. Moreover, H&A's claims mirror, almost identically, those that ESA filed against Thermo in June 2016. However, H&A waited almost eighteen months, until December 2017, to file the same claim against Thermo. This unexplained delay undermines any possible contention that the challenged G-9 amendments are the product of "new" information. *Compare* ECF No. 197, *with* ECF No. 64. H&A cannot demonstrate good cause, and so its G-9 Claims against Thermo are dismissed.

## V. Conclusion

For the foregoing reasons, the Court grants Third-Party Defendants' motions to dismiss (ECF Nos. 244, 357, 358, 359, 361, 362, 363) and ValvTech's motion for summary judgment. ECF No. 360. A separate Order follows.


__March 1, 2019_____             _____/S/_____
Date                                           Paula Xinis
                                                 United States District Judge